IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MICHAEL WAYNE HALL,             §
                                §
          Petitioner,           §
                                §
                                §
VS.                             §   NO. 4:06-CV-436-A
                                §
NATHANIEL QUARTERMAN,           §
DIRECTOR, TEXAS DEPARTMENT      §
OF CRIMINAL JUSTICE,            §
CORRECTIONAL INSTITUTIONS       §
DIVISION,                       §
                                §
          Respondent.           §

MEMORANDUM OPINION
and
ORDER

Came on for consideration the petition for writ of habeas corpus ("petition")[1] filed by Michael Wayne Hall ("Hall"), an inmate in the Texas Department of Criminal Justice, Institutional Division, who is under sentence of death. The court has determined that the petition should be denied for the reasons set forth in this memorandum opinion and order.

I.

Procedural History

On February 23, 2000, in the 371st District Court of Tarrant County, Texas, Hall was convicted and sentenced to death for the murder of nineteen-year old Amy Robinson. On January 16, 2002, the Texas Court of Criminal Appeals affirmed his conviction and

---

[1] While the undersigned recognizes that 28 U.S.C. § 2254 contemplates the filing of an "application" for writ of habeas corpus, the practice of the Northern District of Texas has long been instead to use the term "petition." Consistent with this now ingrained practice, the undersigned refers to Hall's's application under 28 U.S.C. § 2254 for writ of habeas corpus as the "petition" and uses the term "petitioner" in lieu of "applicant."

sentence.  See Hall v. State, 67 S.W.3d 870 (Tex. Crim. App. 2002), vacated, 537 U.S. 802 (2002).  On October 7, 2002, the United States Supreme Court granted Hall's petition for writ of certiorari, reversed the judgment, and remanded the case for further consideration in light of Atkins v. Virginia, 536 U.S. 304 (2002), wherein the Supreme Court held that the execution of a mentally retarded criminal was a cruel and unusual punishment under the Eighth Amendment to the Constitution.  See Hall v. Texas, 537 U.S. 802 (2002).

While Hall's direct appeal was pending, on January 17, 2002, Hall also applied for habeas relief in the trial court.  In response to Atkins, the trial court ordered an evidentiary hearing by affidavit to determine the issue of Hall's mental retardation.  After receiving affidavits from Hall and the state, and also taking into account the evidence offered at trial as to Hall's mental capacity, the court concluded that Hall did not clearly fall within the definition of mental retardation. Alternatively, relying on Atkins, the court held that even if Hall fell within the upper range of mild retardation, he did not fall within the range of offenders about whom there is a national consensus regarding the exemption from the death penalty.  See Atkins, 536 U.S. at 317.

On February 26, 2003, the Texas Court of Criminal Appeals too denied habeas relief.  See Ex Parte Hall, No. 53,668-01 (Tex. Crim. App. Feb. 26, 2003).

Later, on May 5, 2005, on direct appeal, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions from the state-habeas proceedings on Hall's mental capacity.  See Hall v. State, 160 S.W.3d 24, 38-39 (Tex. Crim. App. 2004).  In an abundance of caution, however, the Court of Criminal Appeals also reviewed the evidence, both from the direct appeal and the state-habeas proceedings, and independently found that the trial court's conclusion that Hall is not mentally retarded to be supported by the record.  Id. at 40.  On June 27, 2005, the Supreme Court denied Hall's petition for certiorari. See Hall v. Texas,     U.S.    , 125 S. Ct. 2962 (2005).  On June 20, 2006, Hall filed the instant petition for federal habeas corpus relief.

II.

Underlying Facts

The Court of Criminal Appeals well summarized the facts of the crime as follows:

> Eighteen-year-old Hall and his friend Robert Neville decided to kill someone because Hall was angry that he had a "sucky-ass" life.  They started searching for the right victim and preparing for their crime by obtaining rifles, pellet guns, a crossbow, and ammunition.  After much looking, Hall and Neville finally chose nineteen-year-old Amy Robinson, a friend and former coworker, because she trusted them and they "didn't have to put bruises on her to get her in the car."  The evidence also revealed that Amy had a genetic disorder that made her small and mentally and physically slow.  She stood four feet five inches tall and had the mental capacity of a third or fourth grader.

3

On February 15, 1998, Hall and Neville went looking for Amy in order to carry out their murderous plan. They checked her schedule at the Kroger grocery store and then lay in wait for her to ride by on her bicycle on her way to work. When the pair saw Amy, they coaxed her into the car, promising to drop her at work after they circled around in the country. As Neville drove, Amy complained that she did not want to be late for work.

Neville then pretended to have a flat tire and pulled the car over on a dirt road by a remote field. Hall and Neville got out of the car and walked into the field carrying their weapons while an unsuspecting Amy waited in the car listening to the radio. At some point, Hall persuaded Amy to get out of the car, telling her she needed to go talk to Neville near a tree. As Amy walked toward Neville, he fired a crossbow at her several times. Neville missed each shot, but Amy became angry when the last arrow grazed her hair. When Amy started walking back to the car, Hall shot her in the back of her leg with his pellet gun. Hall and Neville laughed while Amy cried in pain.

Meanwhile, Neville returned to the car and got his .22 caliber rifle. When Hall managed to maneuver Amy back into the field, Neville shot her in the chest. Hall then shot her in the chest "three or four or six times" with the pellet gun. Amy fell to the ground making loud noises and shaking. Hall then stood over her and stared for five to ten minutes. The pair worried that someone would hear Amy, so Neville shot her in the head, killing her instantly. Hall and Neville then left Amy and her bicycle in an area where they would not be easily discovered.

A few days later, they returned to the scene. Neville fired shots into Amy's dead body, and Hall took keys and money from her pocket. When Amy's family and coworkers realized she was missing, a massive search ensued. More than two weeks later, authorities focused on Hall and Neville. Fearing they would be caught, the pair fled Arlington but were soon arrested when they attempted to cross the border into Mexico. The authorities found Amy's body on the day of the arrest.

Hall, 67 S.W.3d at 873.

4

At the sentencing phase of trial, the jurors heard additional evidence about the crime:

> [O]nce Hall and Neville had made their plans and chosen their mentally challenged victim, they taunted and tormented her, reveling in her confusion and agony. Finally, Hall boasted in his media interview that he was the one who got Amy to trust him, and she would have escaped had Neville tried to commit the offense without him.  Indeed, Hall told the media that he had no remorse for Amy's death.  When asked how he felt about Amy dying the way she did, Hall snickered, "Well, I wouldn't want to be in her place.  She had to take a lot of pain."  After his arrest, Hall told law enforcement and the media that he and Neville had wanted to become serial killers and kill one to five people a week.  They also wanted to become white supremacists and kill African Americans.

Hall, 67 S.W.3d at 874.

As far as mitigating circumstances to a death sentence, the jury heard considerable evidence from Hall as to his alleged mental retardation.  The jurors, however, determined that the evidence did not warrant a life sentence.

### III.

### Scope of Review

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("the AEDPA").  Under the AEDPA, the

ability of federal courts to grant habeas relief to state
prisoners is narrowly circumscribed:

> (d)  An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the judgment
> of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the
> claim--
>
>> (1)  resulted in a decision that was
>> contrary to, or involved an unreasonable
>> application of, clearly established Federal
>> law, as determined by the Supreme Court of
>> the United States; or
>>
>> (2)  resulted in a decision that was
>> based on an unreasonable determination of the
>> facts in light of the evidence presented in
>> the State court proceeding.

AEDPA, § 104(3) (codified at 28 U.S.C. § 2254(d)).

The AEDPA further provides:

> (e)(1)  In a proceeding instituted by an
> application for a writ of habeas corpus by a person in
> custody pursuant to the judgment of a State court, a
> determination of a factual issue made by a State court
> shall be presumed to be correct.  The applicant shall
> have the burden of rebutting the presumption of
> correctness by clear and convincing evidence.

AEDPA § 104(4) (codified at 28 U.S.C. § 2254(e)(1)).

Having reviewed the petition, the response, the record, and
applicable authorities, the court finds that none of Hall's
grounds has merit.

IV.

6

Grounds for Relief

Hall urges seven grounds in support of his petition.  They are as follows:

Ground One:    Hall is ineligible for execution under <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), because he is mentally retarded.

Ground Two:    Because Hall was denied a jury determination of mental retardation, his death sentence should be set aside under <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002).

Ground Three:    The indictment under which Hall was charged was constitutionally inadequate, and the mitigation instructions were unconstitutional by failing properly to quantify the burden of proof on mitigation.

Ground Four:    The use at trial of Hall's televised media interview violated his privilege against self-incrimination, his right to counsel, and due-process rights.

Ground Five:    The Texas-death-penalty statute is unconstitutional.

Ground Six:    The evidence regarding Hall's future dangerousness was legally insufficient.

Ground Seven:    The mitigation instructions were unconstitutional, because, <u>inter</u> <u>alia</u>, they allowed the jurors to consider the aggravating aspects of otherwise mitigating evidence.

V.

Discussion

A.   <u>Ground One: Atkins</u>

In <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), the Supreme Court banned the execution of the mentally retarded.  However, "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded

7

offenders about whom there is a national consensus." <u>Atkins</u>, 536 U.S. at 317.  The obvious challenge -- which the Supreme Court, in turn, left to the states to meet -- is how to determine which offenders falls within the range of mental retardation sufficient to render a sentence of death unconstitutionally cruel.  <u>Id.</u>

Here, the State of Texas used a three-part definition borrowed from the American Association of Mental Retardation[2] and generally codified in Section 591.003 of the Texas Health and Safety Code.  Specifically, under this definition, "a person is mentally retarded if he has three characteristics: (1) 'significantly subaverage general intellectual functioning' (an IQ of about 70 or below); (2) 'related limitations in adaptive [behavior],' and (3) onset of the above two characteristics before age eighteen."[3]  <u>Hall</u>, 160 S.W.3d at 36 (citation omitted).  Although the first and third elements are relatively self-explanatory, the second element is perhaps not.  Adaptive behavior generally refers to "the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility of the person's age and cultural group." <u>See</u> Tex. Health & Safety Code. Ann. § 591.003(1) (Vernon 2003). To state a successful claim under <u>Atkins</u>, all three prongs of the

---

[2]The Supreme Court cited to this definition in <u>Atkins</u>.  <u>See</u> <u>Atkins</u>, 536 U.S. at 308 n.3.  The State of Texas also uses this definition in death-penalty cases.  <u>See</u> <u>Ex Parte Briseno</u>, 135 S.W.3d 1, 6-8 (Tex. Crim. App. 2004).

[3]Perhaps because Hall was eighteen-years old when the murder was committed, neither he nor the State devote much briefing, if any, to the element requiring that the mental retardation manifest itself by that age.  As a result, the court does not either.  If Hall were mentally retarded, it is a likely a given that he was so before he turned age eighteen.

definition must be met.  <u>See</u> <u>In Re Salazar</u>, 443 F.3d 430, 432
(5th Cir. 2006).  And it is Hall's burden, by a preponderance of
the evidence, to show that each prong is met.  <u>Hall</u>, 160 S.W.3d
at 38.

In his petition, Hall thoroughly reviews the voluminous
evidence as to his mental capacity.  <u>See</u> Hall's Pet. for Writ of
Habeas Corpus ("Hall's Pet.") at 1-33.  The State does the same
in its response.  <u>See</u> Resp't's Resp. at 4-21.  There is no reason
for the court to do so again here.  Briefly, however, in support
of his claim of mental retardation, Hall offered the testimony of
three psychologists, his mother, his brother, his trial
attorneys, two private investigators, four teachers and a fellow
death-row inmate.  <u>See</u>, <u>e.g.</u>, <u>Hall</u>, 160 S.W.3d at 40.  The State
controverted Hall's claim with the testimony of a psychologist,
five prison guards, a waitress, Hall's former work supervisor, a
former co-worker, and a police detective.  <u>Id.</u>  In addition,
there was, <u>inter alia</u>, evidence submitted as to Hall's school
records and his videotaped interview with the press following his
arrest.  <u>Id.</u>  There were also, of course, the circumstances
surrounding the crime itself.

The specific evidence was that Hall had an IQ of between 67
to 74.  The evidence of adaptive behavior conflicted.  On the one
hand, Hall's witnesses claimed that Hall could not tell time from
a traditional clock, had trouble following instructions, could
not grasp money concepts, had limited social skills, and suffered
from a life-long record of poor academic performance.  On the

9

other hand, the State put on evidence indicating that Hall was average in a number of adaptive behaviors, including the use of tools, health and safety, and appliances. Further, according to Hall's own mother, Hall could read and write well enough to pass a written driver's test and had had at least one, if not two, age appropriate girlfriends. The State's psychologist also found that, during his interview with Hall, Hall acted and talked like an adolescent or young adult. Also, in talking about the murder of Amy Robinson, Hall was fluent, articulate, and related events logically.

Having independently reviewed all of the evidence, the court concludes that, while there is evidence indicative of mental retardation, arguably only of mild mental retardation, there is ample evidence that Hall is not mentally retarded. Consequently, the state court's finding that Hall is not mentally retarded was not unreasonable. See 28 U.S.C. § 2254(d)(2). Nor was the state court's alternative finding that, even if Hall were mildly retarded, he "is not so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." See Atkins, 536 U.S. at 317. Moreover, those findings are presumed to be correct unless controverted by Hall with clear and convincing evidence. See 28 U.S.C. § 2254(e)(1). Hall has failed to meet that burden here.[4] The court thus

_____

[4]The court views the issue of Hall's mental capacity as one of fact. Even if viewed as a mixed issue of fact and law, the state-court decision on this issue was not contrary to or otherwise involved an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d)(1).

concludes that Hall's sentence of death is constitutional. Hall's ground one is denied.

B.   Ground Two: No Jury Finding on Mental Retardation

Relying on Atkins and Ring v. Arizona, 536 U.S. 584 (2002), Hall contends that he was entitled to a jury finding on the issue of mental retardation.  See Hall's Pet. at 34-36.  The holding of Atkins has already been discussed.  In Ring, the Supreme Court held that, where a fact-finding increases the maximum punishment established by the legislature, a capital defendant is entitled to have that fact decided by the jury.  Ring, 536 U.S. at 589.

As correctly pointed out by the State, because Hall failed to raise this issue in the state proceedings, it is procedurally defaulted.  Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991); 28 U.S.C. § 2254(b)(1).  Consequently, federal habeas review of this claim is barred unless Hall demonstrates "cause for the default and actual prejudice as a result of the alleged violation of federal law" or that "failure to consider [this claim] will result in a fundamental miscarriage of justice."  Bagwell v. Dretke, 372 F.3d 748, 755 (5th Cir. 2004), cert. denied, 543 U.S. 1134 (2005), (citing Coleman, 501 U.S. at 750).  Here, Hall has made no attempt to show cause and prejudice for his default or that failure to consider this ground will result in a fundamental miscarriage of justice.  Consequently, the court is satisfied that ground two is procedurally defaulted.

Even if it not procedurally defaulted, Hall's claim that he was entitled to a jury determination on mental retardation is

without substantive merit.  Nowhere in Atkins does the Supreme
Court hold that a jury determination on this issue is required.
To the contrary, in Atkins, the Supreme Court expressly left to
the states the task of developing appropriate ways to enforce the
constitutional restriction on executing mentally retarded
offenders.  See Atkins, 536 U.S. at 317; see also Schriro v.
Smith,    U.S.   , 126 S. Ct. 7 (2005) (holding that the Ninth
Circuit erred by commanding the Arizona courts to conduct a jury
trial to resolve defendant's mental-retardation claim).
Moreover, the Fifth Circuit has specifically held that Ring does
not require a jury determination on mental retardation.  In re
Johnson, 334 F.3d 403, 404-05 (5th Cir. 2003).  This court is
bound by that precedent.  Ground two is also denied.

C.   Ground Three: The Mitigation Issue

     1.   Burden of Proof

     First, Hall argues that Texas's capital-sentencing scheme is
unconstitutional, because it fails to quantify the burden of
proof on the issue of mitigation and fails to specify which party
bears that burden.  See Hall's Pet. at 37-38.  In making this
argument, Hall again relies on Ring.  In Ring, however, the
Supreme Court was abundantly clear that only the issue of
aggravating circumstances -- not mitigating circumstances -- was
before it.  Ring, 536 U.S. at 597 n.4.  Indeed, the Supreme Court
specifically noted that it "'has often recognized a distinction
between facts in aggravation of punishment and facts in
mitigation.'"  Id. (citing Apprendi v. New Jersey, 530 U.S. 466,

12

490-91 n.16 (2000)).  In short, Hall has failed to point to any legal precedent in his favor on this issue.  Consequently, the court rejects this assertion.

    2.  <u>The Indictment</u>

    Hall's second argument concerning the mitigation issue and the indictment is unclear.  <u>See</u> Hall's Pet. at 3738.  As best as the court can decipher, however, relying on <u>Apprendi</u>, 530 U.S. at 476, Hall urges that, in violation of the Constitution, the State failed to plead the absence of mitigation in the indictment.  As is evident, however, from the very language Hall relies on in making this assertion, <u>Apprendi</u> only requires that "any fact . . . that ***increases*** the maximum penalty for a crime must be charged in the indictment . . . "  <u>See</u> <u>Apprendi</u>, 530 U.S. at 476 (emphasis added).  This contention is thus also without merit. Ground three is denied.


D.  <u>Ground Four: Admission of Hall's Videotaped Statement</u>

    After Hall was arrested, he gave reporters an interview that was videotaped.  Hall alleges that the admission of the videotaped interview at trial violated his privilege against self-incrimination, his right to counsel, and due-process rights in contravention of the Fifth, Sixth, and Fourteenth Amendments. <u>See</u> Hall's Pet. at 39.  Or, as well summarized by the State, the gist of Hall's complaint is that when the reporters interviewed him, they were acting as state agents, and the state court's finding to the contrary was incorrect.  <u>See</u> Resp't's Resp. at 29.

13

If a state obtains an incriminating statement from an accused by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent, the Sixth Amendment is violated.[5]  See Maine v. Moulton, 474 U.S. 159, 176 (1985).  Here, there is no evidence that the reporters were acting as agents of the State.  To the contrary, the reporters testified at the suppression hearing that no authority ever suggested that they conduct the interview, and no authority suggested any questions for them to ask.  Hall, 67 S.W.3d at 875.  In fact, the reporters did not even provide authorities with copies of the interview.  Id.  The court therefore concludes that the state court did not err in rejecting this claim.  This court likewise concludes that it is without merit.[6]

E.   Ground Five: The Death-Penalty Statute Is Unconstitutional

Hall raises a number of complaints within his ground for relief wherein he claims that the death-penalty statute in Texas is unconstitutional.  See Hall's Pet. at 40-45.  The court, however, concurs with the State that the only one raised in the state-court proceedings was whether the jury is given too much discretion by the special-issue system.  Because none of the others were raised in the state-court proceedings, they are all

---

[5]For purposes of this analysis, this court, like the Texas Court of Criminal Appeals, has assumed that Hall had been formally charged at the time of the interview.

[6]Hall claims that the interview was given without his consent, because he lacked the mental capacity to give consent.  Because this assertion is purely derivative of his mental-retardation claim, the court rejects it.

procedurally defaulted.[7]  <u>Coleman</u> 501 U.S. at 735 n.1.  And, yet
again, Hall has failed to show cause and prejudice for his
default or that failure to consider these other complaints will
result in a fundamental miscarriage of justice.  Consequently,
federal habeas review of them is barred.  <u>Bagwell</u>, 372 F.3d at
755.

With respect to whether Texas juries are given too much
discretion, the Fifth Circuit has specifically held that the jury
"may be given unbridled discretion in determining whether the
death penalty should be imposed after it has found that the

defendant is a member of the class made eligible for that
penalty."  <u>See</u> <u>Woods v. Cockrell</u>, 307 F.3d 353, 359 (5th Cir.
2002) (citations omitted).  Also, the Supreme Court has held that
Texas's capital-sentencing procedures are constitutional.  <u>See</u>
<u>Jurek v. Texas</u>, 428 U.S. 262, 269-277 (1976).  Thus, the state
court finding against Hall on this issue was not contrary to or
an unreasonable application of federal law.  <u>See</u> 28 U.S.C. §
2254(d)(1).  Habeas relief is not warranted.

F.    <u>Ground Six: Insufficient Evidence of Future Dangerousness</u>

Hall's argument that there was insufficient evidence of his
future dangerousness is premised on his underlying assertion that

---

[7]The procedurally-defaulted issues include, <u>inter alia</u>, that the state-
law judge failed to define "probability" for the jury and such failure gave
the jury too much discretion in deciding the issue of future dangerousness.
Also, the jury was not given guidance as to the meaning of "criminal acts of
violence" and "continuing threat to society."  <u>See</u> Hall's Pet. at 40-45.

Ring requires future dangerousness to be proven beyond a reasonable doubt.  See Hall's Pet. at 45 (citing Ring, 536 U.S. at 602-03).  The court does not read Ring as authority for that proposition.  Apparently neither does the State.  In fact, the State urges that, despite Texas law requiring future dangerousness to be proven beyond a reasonable doubt,[8] the Constitution does not so require as a matter of federal due process.  See Resp't's Resp. at 35-37.

The court, however, need not resolve this debate.  It is satisfied that, even under the stricter standard of burden of proof urged by Hall, the state-court jury's finding that Hall was a future danger was not unreasonable given the evidence in this case.  See 28 U.S.C. § 2254(d)(2).  Among other things, the evidence shows that Hall's murder of Amy Robinson was coldly premeditated.  She was carefully chosen, because Hall thought she would be an easy first kill of what he hoped would be a series of future, weekly and racially-motivated killings.  Also, Hall showed no remorse over her death.  To the contrary, he boasted and snickered about it to the media.  The evidence also showed that he had violent fantasies and dreams of hurting people, which is  common for potential killers.  Moreover, the finding of the state-court jury based on this evidence that Hall was a future danger to society is presumed to be correct unless controverted

---

[8]Although the State does not directly admit that Texas law so holds, it does.  See Tex. Code Crim. Proc. Ann. art. 37.0711(3)(c) (Vernon 2005).

by Hall with clear and convincing evidence.  See 28 U.S.C. §
2254(e)(1).  Hall has failed to do so.  Ground six is denied.

G.    Ground Seven: The Mitigation Instructions Were in Error

      Hall launches various complaints regarding the mitigation
instructions given to the jury.  These include, inter alia, that
they wrongly permitted the jury to consider mitigating evidence
as aggravating evidence, failed to define "moral
blameworthiness," failed clearly to indicate that evidence as to
Hall's mental capacity could be considered as mitigating, and
wrongly restricted the definition of mitigating evidence to "only
that evidence which 'a juror might regard as reducing the
defendant's moral blameworthiness.'"  See Hall's Pet. at 47-52.
Putting aside whether his assertions are even factually
accurate,[9] Hall has failed to show that any of the complained-of
instructions were contrary to, or involved an unreasonable
application of, clearly established federal law as required.  See
28 U.S.C. § 2254(d)(1).  The Supreme Court case of Penry v.
Johnson, 532 U.S. 782 (2001), on which Hall heavily relies, notes
that the key to a constitutional sentencing scheme is that the
jury be able to consider and give effect to a defendant's
mitigating evidence in imposing a sentence.  See Penry, 532 U.S.
at 797.  Hall has failed to persuade the court that such was not

_____

     [9]For example, Hall's assertion that the court's definition of mitigating
evidence was restricted to "only that evidence which 'a juror might regard as
reducing the defendant's moral blameworthiness,'" see Hall's Pet. at 49, is
misleading.  The court instructed the jury to consider "all of the evidence"
in deciding whether "there is sufficient mitigating circumstance . . . to
warrant that a sentence of life imprisonment rather than a death sentence be
imposed."  See Vol. 3 of the Clerk's Record at 234.

the case here.  Hall's final ground is therefore denied as well.

VI.

<u>Order</u>

For the reasons discussed herein,

The court ORDERS that Hall's petition be, and is hereby,

denied.

SIGNED August 3, 2006.

_____/s/ John McBryde_____
JOHN McBRYDE
United States District Judge

18