Winn-Dixie. Hall quit Winn-Dixie because Neville told him that he could get a better job at a place where the two of them could work together.

For about two weeks after Amy Robinson disappeared, Hall stayed at night with Neville at Neville's grandmother's apartment. During that time Hall came home every day, bringing his dirty clothes, picking up clean clothes, and sometimes picking up video games, magazines, and a VCR. Hall never mentioned to her that the police had contacted him while they were searching for Amy, though he did tell her that Neville had talked to the police.

Her last contact with Hall before he was arrested was when she took him to the Kroger store, where he was to meet Neville. When she dropped him off he told her "I love you," and then went into the store. R. of Crim. Trial, Vol. 33 at 135. When Hall did not return or call her that night, she called the police about Hall being missing. After she reported Hall missing, and the police came to her house to discuss the situation, Mr. Gray's thirteen-year-old son, Alleron, told her about a conversation he had with Hall concerning Amy Robinson. She then called the Arlington police and reported that she thought she knew who killed Amy. At that time she had concern about Hall, thinking

that Neville might have killed him. However, Hall did not seem to be afraid of Neville.

(2) <u>Damon Hall</u>

Damon was Hall's older brother. His date of birth was March 27, 1975. He discussed his employment and educational background and problems he had with misuse of drugs and alcohol. Damon was asked about things that happened to Hall when he was a child that could have resulted in a head injury. He believed that Hall had problems with respect to how smart he was. Damon was standing behind Hall when Hall had his Kroger check cashed, and Hall was $10.00 short but did not realize it. Hall's writing was poor, and his drawings seemed childish. He had a difficult time explaining a question. As they were growing up, Damon from time to time would take advantage of Hall by talking him into doing things that were not to Hall's advantage.

Damon described the environment at the house where he and Hall were raised. His father and mother had a fight while Hall was in the house. Hall was a loner, an outcast, and an oddball; and, there were times when he would rescue Hall from younger kids who were picking on him. Hall did not have many friends his own age. Damon had difficulty causing Hall to interact with Damon's friends. His understanding is that Hall had a girlfriend once.

When Hall was seventeen he told Damon that he wanted to die, and Damon noticed that he had slash and burn marks on his arm. He discussed how Hall acted when he was on Ritalin.

Damon and Hall had difficulties with their father. They heard their father yelling more than talking. When he and Hall were growing up, he smelled marijuana in the house, and he fussed at his mother because of the odor coming from her bedroom. A son of one of his mother's boyfriends, who apparently stayed with them awhile, antagonized Hall, and Hall would get upset, but would have to be pushed really far before he would retaliate. He discussed a drinking problem that his mother had, which was so bad that he left to go live with his father.

Hall had trouble telling the time, but he could read a digital watch. Hall had a hard time following directions, but he pretty much could follow them if they were given to him slowly.

Damon met Neville once, and it was shortly before he heard that Hall had been arrested. He believed that Neville had significant influence over Hall. He mentioned to his mother that Hall should not be hanging around Neville. Damon noticed that after Hall started being with Neville, Hall did things differently from what he did before. His music changed, his

attitude changed, and the video games he played were a lot more detailed and gory.

Damon lived in an apartment with friends for a period of time before Hall left home the final time. When he visited Hall, he noticed that Hall was acquiring more hard-core video games, involving more blood and violence, and Hall seemed to enjoy those games. Also, he saw that Hall was taking an interest in hard-core music, including music containing satanic lyrics. He noticed those things about two or three months before Amy Robinson's murder.

Hall had the telephone number at Damon's apartment, and would call him from time to time, and on occasion Hall would visit with one or the other of Damon's roommates over the telephone. One of Hall's calls to a roommate was on the subject of whether the roommate could get him a gun.

After Amy Robinson disappeared, and before Hall left with Neville and was later arrested, Damon and several of his friends were at his apartment while Hall was there. Hall was on the couch crying. Damon assumed that the problem was depression from what was going on in Hall's household. His mother's boyfriend, Larry Gray, was having an affair with Rebecca, Hall's sister, and Hall was upset about that. Damon tried to bolster Hall's morale.

The night before Hall and Neville left, Hall spent the night at Damon's apartment, and Damon had a long conversation, about two hours, with Hall. Hall broke down emotionally, and Damon tried to offer encouragement to Hall. Nothing was said about Amy Robinson, who by then had been reported missing. The following morning Hall got up, gathered up his games and everything, and said he was going fishing with Neville, who showed up at the house. That was the last time he saw Hall and the only time he met Neville.

    (3)  <u>Ken Trainer</u>[7]

Mr. Trainer is a school teacher who taught a wood shop class in which Hall participated during the 1995-96 school year at North Garland High School. Hall was a ninth grader in the fall session and a sophomore in the spring session of that school year. Because of the nature of the course he taught, Mr. Trainer often had special-education ("special-ed") students in his class, and has had such students throughout the fourteen years of his tenure as a teacher. He had two or three special-ed students in Hall's classroom. He viewed Hall to be "pretty much as mentally

---

[7]Mr. Trainer's name is spelled "Traynor" in the Record of Criminal Trial. The court is of the belief that the correct spelling is "Trainer."

disturbed coming into the class." R. of Crim. Trial, Vol. 33 at 274.

Mr. Trainer had difficulty at the outset teaching Hall some of the simplest tasks, and Hall was frustrated that it took him longer to get things accomplished. Hall wanted to be like any other high school student--"[h]e wanted to get things done, just get it over with and do it now." Id. at 275. Even though Hall was frustrated, Hall kept things to himself. He did not see any kind of anger, violence, or anything like that in Hall. Notwithstanding his frustration, Hall would come back to it and get back to work. The students would pick on each other from time to time. If anybody picked on Hall, he would draw back and kind of hide in a shell. He did not consider Hall to be a danger.

Their first class project was to make a baseball bat holder. Normally it took the students two or three weeks to complete the project. It took Hall about eight weeks to complete it. Often Hall simply did not work, instead he just sat at his desk. It took Mr. Trainer a long time to motivate Hall to get him busy and to get him started working on the project. He had to show Hall every step what to do. Sometimes Hall would not remember what he

did at a certain step and would have to learn it over again. Hall could not do even the simplest math.

The second class project was to make a flower cart, which involved spokes on wheels. Hall had difficulty making the preparation for drilling the holes. Hall finished the flower cart project in normal time. Mr. Trainer attributed that to the fact that they were going into the second semester of school, and Hall was seeing other kids working on their own projects that they had designed and were building themselves, and Hall wanted to get on to another project.

Hall was further behind than the other special-ed students he had in that class. As time went by, he understood more about Hall. Every task Hall did was simpler to him than the ones before. However, Hall continued throughout to have difficulty in his wood shop work. Hall's final project was a motivation to Hall, and he worked extra time, sometimes after school, in order to do it. At the end, Mr. Trainer saw in Hall a sense of completion with that project--Hall had finally completed something. Mr. Trainer thought that the final project probably gave Hall more motivation than anything--just to be able to complete it and get it built. Hall had pride in his project, and he wanted to get it home and get it working. During the time

Hall was working on his final project, Mr. Trainer never had to motivate him because the project was something Hall wanted to build.

Often when Hall came to class, he would seem to be "way outside the classroom altogether." Id. at 287. He would come in, stare for a long time, and then put his head down and go to sleep. When he gave Hall instructions, Hall would say that he understood, but he really did not. Oftentimes his students paired up to get projects done, but Hall stayed pretty much to himself.

Hall did not have many absences from his class, and he normally arrived on time. Hall was appropriately dressed each day, and complied with the rules of conduct for the most part, except on occasions Hall had the idea that he wanted to do it his own way. Hall knew the difference between right and wrong and could follow the basic rules that are necessary to follow in a school society. Hall worked on the wood shop machines like other students. He thought Hall's motor skills were quite adequate. He was pleased, and surprised, with Hall's progress through the school year. Hall had a lot of determination to complete a project, and that is what motivated him. He has had students with backgrounds similar to Hall's who did not reach that point

of completion.  He was very proud of what Hall did.  By the end
of the school year he saw that Hall was feeling better about
himself and feeling a little bit of pride at the outcome.  When
Hall responded to Mr. Trainer's inquiries, it would be an
appropriate response he could understand.

(4)  Cheryl Kay Conner

When she testified, Ms. Conner was a self-employed school
psychologist, acting as a consultant.  Before that she had been a
school teacher for twenty-one years.  During the 1994-95 and
1995-96 school years she was employed at North Garland High
School as a resource teacher and contact-mastery teacher.  She
was not acting as a school psychologist at that time.  During
those two years she was involved in Hall's education as his
English, reading, and math teacher for a period of time, and also
served as his monitor teacher with the responsibility to monitor
his behavior outside classes and to keep up with his attendance
and grades.  Because of the nature of her relationship with Hall,
she probably knew more about him than any other school employee.
Hall was a special-ed student.

In Hall's reading class, Hall rarely kept his head up and
rarely gave any eye contact; he had a sense of humor, but it was
slightly bizarre; he never initiated any communication; and he

fell asleep frequently.  His reading comprehension probably was on the first-grade level, though he could figure out what the words were in the sense that he could call the words.  At the end of Hall's second year he had earned enough credits to be considered a sophomore.

He probably, by use of a pencil and paper, could do math up to a third-grade level, but he could not do multiplication from memory, nor could he do addition or subtraction in his head.  She checked his progress every five minutes to keep him on task; otherwise, he would drift off, either begin to sleep or just sit there, do nothing, and stare.  He could not write a complete sentence unless he had very frequent prompts from her.  When he was instructed to so something, he was not always successful even if there was only one instruction at a time.  If he was given two steps in sequence, he could not remember the second step.

Hall attempted to conceal his shortcomings by bragging and boasting.  It sounded as if he was repeating things that he had heard previously, and sometimes he would say things that were not appropriate.  Because of that conduct, the others in the class ostracized Hall further.  He did not even fit in with the other children in the special-ed class.  Most of the time when he would try to interact, the things he would say were so bizarre that the

other students became upset, and perhaps even angry, but after awhile they just ignored him. Hall very much wanted to fit in, he wanted to please, and he wanted the other students to like him. She observed that Hall was susceptible to being manipulated by other students. Other students teased and antagonized him.

During Hall's freshman year, he had a close friend he did things with. The friend was a boy who was learning-disabled in the sense that he had normal intelligence and just had a learning problem. The friend was the leader between the two.

Hall did not have disruptive behavior. He was always very compliant and tried to please, had no discipline problems, and was always polite and respectful. The only thing noncompliant about his conduct was that consistently in the classroom he slept and did not do his assignments. Reports from Hall's other teachers were that Hall was lazy.

She was concerned that Hall was severely depressed. She wanted to have him tested for depression, but Hall's mother would not permit the testing. Hall's mother did not want him in a special-ed class; she wanted him put in the mainstream classes. She had several conversations with Hall's father. He probably was one of the most disinterested and negative parents she ever encountered. The last two times she called the father to make a

report on Hall's progress, the father told her not to call him any more, that he was not interested and did not care, and that he had washed his hands of Hall and did not want to know anything else.

There was a gap of about six weeks in the spring of 1996 when Hall did not come to school. He told her that the problem was that he had had a fight with his mother because she was drinking too much and that his father was drinking a lot and ignoring Hall. When he returned, his hair was rarely washed, he rarely washed his hands, his clothes were always rumpled and never seemed to be clean, and Hall was very, very depressed. Hall almost looked drugged--he could barely keep his head up and his eyes focused when he was spoken to. Hall told her at that time that his father had kicked him out of the house.

Hall always shuffled--he never picked up his feet. She had to ask him to have eye contact--he always kept his head down and mumbled. Teachers commented that he would talk to himself. He would keep his mouth open, and there were comments from teachers that he drooled. She considered Hall to be a concrete thinker, meaning that if he could not see it, touch it, smell it, taste it, then he had a hard time understanding it. He had a very difficult time with abstract ideas, such as understanding that a

day is part of a year or even that the months went in an order or how many months there were.

She said that if Hall was interested in a task, he would begin it on his own; but, she added, the subjects she had him in, math, English, and reading, were not fun subjects, so he was not interested in starting them. She had the impression that Hall did not ask for help because he did not know how to formulate a question asking for it. He had difficulty with sequential order, such as the sequence of steps necessary to make a peanut butter and jelly sandwich. He could not come up with a plan, such as a plan for working on his assignments. Her impression was that he was very good at playing video games, and enjoyed it a lot. When he would come to school he seemed to be living in a fantasy world like the video games.

He was required to wear glasses, and was subject to punishment if he failed to do so, but he refused to wear them.

Hall did well in a very concrete, structured environment where he knew what the schedule was, what the rules were, and that the rules were consistent. He did not do well in a looser environment where there were options. He rarely stayed on task or made productive use of his time.

On cross-examination by the prosecutor, Ms. Conner disclosed facts that were not developed during the direct examination. As part of an individual assessment done by the Garland school, Hall was given a TONI, a nonverbal intelligence test, and had an IQ score of 84; and, he tested on the WISC-R with an IQ score of 71. He was classified as learning-disabled, but was not classified as mentally retarded.

Hall would attempt to socialize with females, but they would rebuff him. The fantasies he had were violent, involving injuries to other people. She attributed the fantasies to the video games he played. When he returned from being absent for a period of time, he seemed to have fewer fantasies, but was very, very depressed and more withdrawn than ever--he almost was catatonic.

Reports she received from Mr. Trainer and another teacher, Mr. Bays, who was in the industrial arts area, were very complimentary of Hall, even in Hall's vocational assessment, which showed that Hall's high skills were in the manipulative tasks. Part of the reason for Hall's classification as learning-disabled was that he failed to live up to his potential abilities. She disagreed with an assessment that was made as a result of measures made of Hall's adaptive behavior that his

"level of intellectual functioning is consistent with his or her adaptive behavior, with no significant deficits in either area." R. of Crim. Trial, Vol. 34 at 56. That assessment was made by an employee of the school district.

On redirect she explained that the TONI intelligence test usually tests about ten points higher than a WISC, and with some students even higher than that. The WISC is a fairly verbal intelligence measure and the TONI requires no verbal intelligence. The 71 on Hall's WISC is one point above the dividing line for mental retardation. There is a margin of error in the test results. Depression can affect the outcome of an intelligence test--it will lower an IQ score. She felt that during the two-year period when she was working with Hall, his IQ was declining.

(5) Chris Bybee

Mr. Bybee was Hall's math teacher at North Garland High School during the 1995-96 school year. He described Hall as being very quiet, someone who kept pretty much to himself, slow, hard to motivate, not a troublemaker, not tending to be in class discussions, not interacting with other students, and not initiating conversations. He was able to cause Hall to accomplish things when he had a one-on-one discussion with Hall.

Hall could not do multiplication or division, but he could do double-digit addition and subtraction, using what Mr. Bybee referred to as stick fingers on paper. Hall never created discipline problems. Mr. Bybee did not witness harassment or taunting of Hall by other students.

He and Hall had some discussions regarding Hall's home conditions. Hall told him that he and his father had a bad relationship, and Hall thought that his father hated him. It was difficult for Hall to follow instructions on academic matters. He guessed, from the work he got out of Hall, that Hall's IQ score would be in the upper sixties. Most of the time Hall seemed to be unmotivated in class. Sometimes he thought that Hall was not giving it enough effort, that he was giving up too quickly, and that he was lazy. Occasionally Hall slept in his class. Otherwise, Hall's behavior in his class was appropriate, except when on occasion Hall would say something inappropriate to the conversation.

(6) Tom Mueller

Mr. Mueller became acquainted with Hall on January 5, 1999, while he was doing jail ministry at the jail where Hall was confined. When Mr. Mueller arrived at the jail on January 5 the jail chaplain gave Mr. Mueller a Bible to take to Hall,

explaining that Hall's mother had brought the Bible for him. He took the Bible to Hall, and then ministered to Hall that night. Hall's attitude toward him and the ministry was very positive. He could tell that Hall was very sincere about wanting to learn more about the Lord. Hall told him that he had accepted Jesus Christ as his Lord and Savior, and that he knew that Jesus had forgiven him for his sins and that some day he would be with Jesus in heaven. Mr. Mueller could tell that Hall was very sincere and honest, and he was very open with Mueller.

When Mr. Mueller was preparing to leave Hall on that first visit, after having been there more than an hour, Hall asked him if he could pray for Mueller, and when Mueller consented, Hall did so. For a period of three or four months he saw Hall every Tuesday night. There were three or four different inmates with Hall during the time he was seeing Hall, and each of the other inmates told him what a blessing it was to have Hall with them because they would pray and study the Bible together, and Hall would help them work through their problems. Hall was ministering to the other prisoners.

His reaction to Hall was that Hall was not the brightest person, and had a hard time reading and sometimes had a hard time putting things together, but Hall did put together that he knew

who Jesus Christ was, he knew he was forgiven, and he knew that someday he would be in heaven.

He sometimes helped Hall find verses in the Bible. Hall told him on numerous occasions that he hoped someday he would have a chance to meet Amy Robinson's parents and ask for their forgiveness. Hall was very sorry for what he had done.

      e.   <u>Witnesses (in Addition to Dr. Price) Called by State on Rebuttal</u>

(1)  <u>Alan Boles</u>

Mr. Boles, who was eighteen years of age, worked with mentally challenged children for City of Arlington, Texas, where he had been employed for six months. From August 11, 1997, until sometime in September 1999 he was employed at a Kroger store, where he became acquainted with Hall. He worked with Hall three or four days each week. Hall trained Mr. Boles to do his job as a courtesy clerk, bagging groceries and taking them out to the customer's vehicle. Hall explained to him the proper way to sack groceries, such as not putting chemicals and cleaning samples in with the food products, to double-bag the heavy items, and that sort of thing. Hall was able to give him those instructions and to demonstrate to him how to sack the groceries.

He worked with Hall for six or seven months. Mr. Boles did not notice anything slow about Hall while he was working with him. He also worked with Amy Robinson. She was not as quick mentally or physically as Hall. He liked Amy, and is angry toward Hall for what he did to her.

(2) <u>Monica Zepeta</u>

Ms. Zepeta was employed at a restaurant in Castroville, Texas, in February 1998. In late February or early March 1998 Hall and Neville came into the restaurant between 8:45 and 8:50 p.m. to have dinner. She gave them menus, and both appeared to read their menus. Neville ordered for himself, and Hall separately ordered for himself. Hall's order was different from Neville's.

She served with their meals a steak knife and two forks. She did not see Hall picking up his food with his hands. He was using proper eating etiquette. While they were in the restaurant they were laughing and having a good time. They flirted with her and tried to encourage her to go to their room to have drinks and then to show them the town.

As they were leaving, Hall asked her for a date the following morning. She agreed, but she did not actually plan to be there. Later that evening, Hall called her on the house

phone, and encouraged her to come to the room and have drinks with him. She declined. The next time she saw Hall and Neville was when she saw them on TV following their arrest.

(3) <u>Richard Daniel Nutt</u>

Mr. Nutt is an officer with the City of Arlington Police Department. He was involved in the investigation of Amy Robinson's death. After Hall and Neville were arrested in Eagle Pass trying to cross the border into Mexico, he went to Eagle Pass with his partner for the purpose of interviewing Hall and Neville.

When Hall was given his Miranda warning, he looked Officer Nutt in the eye and told him he understood. Hall agreed to be interviewed. As Hall gave his statement another Arlington Police Department employee who was present typed what Hall related. The interview lasted one hour and fifty-one minutes. After the interview, Officer Nutt read the statement to Hall and made needed typographical corrections. Hall appeared to understand what was being said. He initialed each page at the top and bottom. The typewritten statement was read to the jury. It relates basically the same facts, but with more detail, that Hall related to Special Agent Corley. <u>Supra</u> at 18-20.

2.  Pertinent Parts of the Court's Charge to the
    Jury at the Punishment Phase of Hall's Trial

Hall's case at the punishment phase was submitted to the

jury on three special issues.  The one pertinent to Hall's mental

disability claim was Special Issue Number 3, which was worded as

follows:

> Taking into consideration all of the evidence,
> including the circumstances of the offense, the
> Defendant's character and background, and the personal
> moral culpability of the Defendant, do you find that
> there is a sufficient mitigating circumstance or
> circumstances to warrant that a sentence of life
> imprisonment rather than a death sentence be imposed?

Clerk's R., Crim. Trial, Vol. 3 at 238.  The jury was instructed

that they could not answer Special Issue Number 3 "Yes" unless

ten or more jurors agreed, and that they could not answer it "No"

unless they were in unanimous agreement.  Id. at 234.  The jury

was further instructed that it need not agree on what particular

evidence supported an affirmative finding on Special Issue Number

3, and that in deliberating on that issue the jury should

consider mitigating evidence to be evidence that a juror might

regard as reducing Hall's moral blameworthiness.  Id.

3.  Arguments by Counsel at Hall's Trial Directed
    to the Issue of Mental Retardation

After the conclusion of the evidence and after the court's

charge was read to the jury, counsel for each side presented a

jury argument pertinent to Hall's mental retardation contention. The focus of the argument pertaining to Hall's mental capabilities was Special Issue Number 3. Defense counsel strongly urged the jury that they should answer Special Issue Number 3 in favor of Hall based on the evidence of his mental disability, particularly the evidence that he is mentally retarded. R. of Crim. Trial, Vol. 36 at 39-47.

### 4.  The Jury's Verdict

The jury answered Special Issue Number 3 "No." Clerk's R., Crim. Trial, Vol. 3 at 238. Put another way, each of the twelve members of the jury concluded that none of the evidence that Hall was mentally retarded, or otherwise mentally challenged, established a sufficient mitigating circumstance to warrant imposition of a sentence of life rather than death. However, the jury was not asked to decide whether Hall was mentally retarded, nor was it given in the court's charge a definition of mental retardation.

### C.  State Court Habeas Proceedings

### 1.  General

On January 17, 2002, Hall filed an application for writ of habeas corpus in the state court, asserting as his first claim for relief that he is mentally retarded and that the Eighth

Amendment to the United States Constitution would be violated if he were to be subjected to the penalty of death. Clerk's R., St. Habeas, Vol. 1 at 8. The definition of mental retardation Hall suggested in his application is basically the same as the one to which Hall and respondent stipulated at the commencement of the December 10, 2008, hearing. Id. at 11.

### 2. Evidence Made a Part of the Record of Hall's State Habeas Proceedings

#### a. Affidavits Filed with Application

Hall's application was supported by six affidavits, which were summarized in his application as follows:

#### (1) Sally Church, Ph.D.

Dr. Church is a Ph.D. psychologist with extensive training and experience in matters concerning mental health and mental retardation. She has performed numerous psychodiagnostic evaluations and assessments.

With regard to this case, Dr. Church has reviewed Applicant's family history; Applicant's school, medical, employment, jail, and prison records; previous psychological evaluations performed on Applicant; investigation reports; the testimony from Applicant's trial and witness affidavits. She has also conducted a psychodiagnosic evaluation of Applicant at the Polunsky Unit of the Texas Department of Corrections.

Based upon her review of documentary evidence and her psychodiagnostic evaluation of Applicant, Dr. Church's professional opinion is that Applicant is mentally retarded. The most recent testing places Applicant's I.Q. at 67, and this score is consistent with previous intellectual testing. Dr. Church is able

to state that, based on this I.Q., ninety-eight percent (98%) of the population operates at a higher level of intellectual functioning. Thus, Applicant is significantly subaverage.

Further, in Dr. Church's professional opinion, Applicant has critical deficits in his adaptive skills and behavior. In fact, Dr. Church believes that it is "highly doubtful that he alone could meet the needs of his da[y] to day life."

Finally, based on the reported history and documentation, Applicant has suffered from mental retardation since a very early age, if not from birth. Thus, his condition originated during the developmental period.

In addition to her diagnosis that Applicant is mentally retarded, Dr. Church notes that Applicant's physical appearance is typical of a person who suffers from Fetal Alcohol Syndrome or Fetal Alcohol Effect. It is entirely possible that Applicant suffers from one of these conditions as there is evidence that Applicant's mother was an alcoholic. Either of these conditions would be a correlate of Applicant's mental retardation.

Also, Applicant exhibits characteristics consistent with genetic disorders such as XXY, Kleinfelter Syndrome, YYX, Extra Y Chromosome, or Fragile X Syndrome. All of these disorders are usually related to mental retardation and are present at the time of birth.

By way of explaining the fact that Applicant will appear, at first blush, to be much more intelligent than he actually is, Dr. Church states that,

> [Applicant]'s main motivation is not to [appear] to be a 'dummy' in order to mask his deficits. He tends to say what he has heard others say and/or to say what he thinks others want or expect him to

say. This is not at all unusual as a coping
mechanism for the Mentally Retarded person.

Clerk's R., St. Habeas, Vol. 1 at 11-13.

(2) Bill Coble

Mr. Coble resides in the cell immediately adjacent
to Applicant's cell on death row at the Polunsky Unit.
Mr. Coble has known Applicant since Applicant arrived
on death row. Mr. Coble has never read anything about
Applicant's case and has not been made privy to the
findings of the experts who have evaluated Applicant to
determine if he is mentally retarded or the standards
for determining if Applicant is mentally retarded.

According to Mr. Coble, Applicant is referred to
as "half-deck" by the guards and other inmates on death
row. The reason for this nickname is Applicant's
obvious lack of intellectual functioning. Indeed, Mr.
Coble has had the opportunity to know both Applicant
and Johnny Penry, and believes that Applicant is "worse
off" than Penry.

Mr. Coble has to supervise all of Applicant's
correspondence for him. In other words, Mr. Coble
writes answers to letters for Applicant, and then
Applicant copies the letters in his own handwriting.
It takes "weeks" for Applicant to copy a letter that
Mr. Coble gives him. Further, Mr. Coble tries to teach
Applicant new words, but he has to tell Applicant the
meaning of those words over and over, and Applicant
"never really seems to get it."

As an example of Applicant's inability to grasp
simple concepts, Mr. Coble once told Applicant that he
was "putting the cart before the horse." Applicant did
not understand that saying at all. Mr. Coble explained
the saying to Applicant a couple of times, but when Mr.
Coble inquired if Applicant understood it two or three
days later, Applicant did not know.